UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK WISCHNEWSKI,

                              Plaintiff,

                                                    **REPORT AND**
                                                    **RECOMMENDATION**

        v.
                                                    13-CV-1231A

NRG ENERGY, INC.,

                              Defendant.

## I.    INTRODUCTION

        The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C.

§ 636(b).  (Dkt. No. 8.)  Pending before the Court is a motion for summary

judgment by defendant NRG Energy, Inc. under Rule 56 of the Federal Rules of

Civil Procedure ("FRCP").  (Dkt. No. 17.)

        Plaintiff Mark Wischnewski claims that defendant discriminated against him

on the basis of his bipolar disorder, in violation of Title I of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–12117; Section 504 of the

Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794; and the New

York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290–301.

According to plaintiff, the discrimination took the form of workplace harassment,

insistence on a "fitness for duty" examination, retaliation for complaining about

workplace safety, and termination.  Defendant responds that at least some of

plaintiff's claims are untimely; that the Rehabilitation Act does not even apply; that any harassment that plaintiff experienced was no more than personality conflicts between coworkers; and that plaintiff lost his job because he walked off the job twice during disagreements with coworkers, in violation of company policies.

The Court his deemed the motions submitted on papers under FRCP 78(b). For the reasons below, the Court respectfully recommends granting the motion.

## II.   BACKGROUND

This case concerns allegations that defendant harassed plaintiff and brought about his termination because he was bipolar and because he complained about safety deficiencies. Defendant is a Delaware corporation with a principal place of business in New Jersey. Locally, among other operations, defendant operates the NRG Huntley Generation Station (the "Huntley Plant"), a coal-fired power plant in the Town of Tonawanda. Plaintiff began working at the Huntley Plant in 2004 as a temporary worker with the title of "Coal Handler A." Plaintiff accordingly joined the International Brotherhood of Electrical Workers, Local Union 97 (the "Union"), which represents at least some of the employees at the plant and has a collective bargaining agreement ("CBA") with defendant. Plaintiff's first two years at the Huntley Plant appear to have proceeded uneventfully. In 2006, plaintiff bid for and received a permanent, full-time position at the Huntley Plant with the title of "Coal Handler B." As a Coal Handler B,

2

plaintiff helped clean and maintain the plant's coal handling area, which required shoveling coal and operating conveyors that moved coal. From the absence of any information to the contrary in the complaint, plaintiff's first few years as a Coal Handler B seem to have passed without incident.

The alleged incidents that gave rise to this litigation appear to have begun around late 2009. Although the record contains no medical records confirming a date of incident, plaintiff stated in his complaint that he suffered an unspecified shoulder injury on December 9, 2009.[1] The injury limited plaintiff to lifting no more than 50 pounds over his shoulder.[2] That same day, plaintiff asked his coworkers for assistance with his job duties. Rather than provide help, plaintiff's coworkers harassed him and took affirmative actions to make his job more difficult. Still on December 9, 2009, plaintiff had a meeting with his Union steward and defendant's representatives to complain that his foreman harassed him. Plaintiff also complained at the meeting that defendant was asking him to perform his job in an unsafe manner. When defendant ignored plaintiff's safety concerns

---

[1] For the sake of the pending motion, the Court will take plaintiff's chronology of the events of December 9, 2009 at face value. The Court notes, however, some concern about the compressed nature of this chronology. Specifically, the Court wonders whether the shoulder injury, formal diagnosis with specific limitation to 50 pounds, return to work, requests for assistance, harassment, and subsequent meeting all happened in one day.

[2] The record does contain a general acknowledgment of plaintiff's injury and defendant's consideration of accommodations. (*See* Dkt. No. 22-9 at 8.)

3

and continued to harass him, still on December 9, 2009,[3] plaintiff walked off the

job.  On December 16, 2009, representatives of defendant and the Union met

with plaintiff to discuss his walk-off.  Plaintiff acknowledged that he knew the

procedure for notifying defendant of a need to leave before the end of a shift.

Nonetheless, plaintiff stated that he was upset and had a hard time keeping

perspective.  (*See also* Dkt. No. 22-9 at 7 ("To be honest with you, I was hot

headed when I spoke to you on the phone.").)  Plaintiff also raised the issue of

harassment at the December 16 meeting, the first time that he brought the issue

to defendant's attention.  (*Id.* ("Today, I am notifying the company that I am being

harassed.").)  At the meeting, plaintiff said nothing about disabilities apart from his

shoulder injury.  Defendant warned plaintiff that he always needed to follow

notification procedures before leaving the Huntley Plant for any reason.

Defendant ultimately decided not to fire plaintiff.  The parties dispute whether, at

a meeting with human resources staff the next day, plaintiff withdrew the

allegations of harassment that he made at the disciplinary meeting.  (*But see* Dkt.

No. 21-1 at 44–45 ("We came to a solution.  Now that—I can remember this.  We

came to a solution to get off his crew and go on another crew.  And I said, let's

do it.  And I got on Jim Nosek's crew.  And for the most part it was good.  His

───────────────────

[3] Paragraph 17 of the complaint claims a walk-off date of December 9, 2010, but plaintiff has not disputed defendant's assertions that the walk-off occurred on December 9, 2009 as part of the other events that plaintiff has described.

crew was a lot easier to get along with.  Jim Nosek was not a—he's not a person

to aggravate me at all.  I had no complaints.  So, yes, that was a solution of what

we had came down to, was going on that crew.").)

Plaintiff's narrative next moves forward seven months to the middle of July

2010.  On July 21, 2010, plaintiff had an incident in the Huntley Plant parking lot

with two coworkers who worked the shift after his own.  According to plaintiff,

these coworkers were unhappy with their own job duties and took that frustration

out on plaintiff.  The harassment in question took the form of a stare-down and

then attempted physical intimidation.  Plaintiff reported the incident to defendant,

who investigated by interviewing the two coworkers in question.  The coworkers

admitted confronting plaintiff and claimed to confront him about the quality of his

work but denied harassing him.  Defendant reminded the coworkers of its policies

against harassment.  Over plaintiff's objection, defendant ultimately concluded

that no harassment occurred and that the confrontation was simply a workplace

disagreement.  At no time during the investigation did plaintiff assert that any

harassment occurred on the basis of actual or perceived bipolar disorder.

A few weeks later, on August 12, 2010, plaintiff walked off the job again.

Plaintiff asserts that he walked off the job because his coworkers were harassing

him again and because defendant was asking him to do his job in a way that was

unsafe and harmful to chronic problems that he had with his elbow and carpal

tunnel.  Specifically, plaintiff and his crew chief disputed whether plaintiff should

5

clean his assigned area for the next shift by hosing coal debris into a sump pump pit or by shoveling it for disposal with solid waste.  Defendant wanted plaintiff to shovel away solid debris, but plaintiff protested that the shoveling would expose him to injury and would place him too close to moving conveyor belts.  (*See* Dkt. No. 21-1 at 50 ("Unsafe.  STRIVE.  Unsafe.  It's right in there.  I told him, you cannot go back there.  It was a well-known fact that no one could shovel back there.  You only got a foot and a half.  How could you take that shovel and take that coal and put it into that?  You tell me how.").)  When the dispute escalated, plaintiff walked off.  Plaintiff asserts that he followed proper procedure by trying to contact his supervisor before leaving.  Two days later, on August 14, 2010, defendant held a disciplinary meeting with plaintiff and a Union representative. Plaintiff explained the harassment about his job performance that he had received.  Plaintiff also explained why he considered shoveling near a moving conveyor belt unsafe.  Plaintiff further explained his feelings of frustration about being ignored and his fear of retaliation if he complained too much about intimidating and harassing behavior.  Over the course of the meeting, according to plaintiff, defendant's representatives made comments to the effect that plaintiff "got issues," "needs help," and "was frustrated and upset."  Another comment that allegedly came up was a comment to the effect that plaintiff has 19 personalities and that talking to him sometimes is not easy.  To the extent that the parties agree that some sort of comment was made, they dispute whether the phrase "19

6

personalities" referred to plaintiff only or all the employees in plaintiff's department.  (*See* Dkt. No. 21-1 at 14.)  At the end of the meeting, defendant suspended plaintiff with pay pending further investigation.  Defendant also asked plaintiff to undergo a "fitness for duty evaluation," to determine whether any medical condition may have contributed to plaintiff's behavior and could mitigate any disciplinary action.

The fitness for duty examination was the first of several events that occurred while plaintiff was suspended with pay.  Dr. Stuart Dorfman, M.D., performed the examination on September 14, 2010.  (Dkt. No. 28-5 at 1.)  Dr. Dorfman assessed some anxiety and depression and referred plaintiff for a psychological evaluation the following month.  Meanwhile, on October 1, 2010, plaintiff called defendant's ethics hotline and complained that his suspension constituted harassment.  The parties appear to disagree whether plaintiff, during this call, attributed any harassment to actual or perceived bipolar disorder.  Plaintiff underwent the psychological evaluation with Jeffrey Lackner, Psy.D., on October 5, 2010.  Dr. Lackner found as follows:

> The clinical picture that emerges from psychological testing is of an individual who, while having a history of anxiety, depression, and frustration intolerance, does not have a psychological impairment that would interfere with his ability to return to work.  By his own admission, he can perform the essential demands of his job.

(Dkt. No. 28-6 at 1.)

On November 9, 2010, in the presence of a Union representative, defendant met with plaintiff and fired him.

One more major event occurred between plaintiff's firing and the start of this litigation.  On November 17, 2010, the Union filed a grievance under the CBA challenging plaintiff's firing.  The grievance made no mention of discrimination. While the grievance was pending, the Union scheduled a meeting with plaintiff to advance its investigation of the matter.  Plaintiff wanted to record the meeting; when the Union told him that recording was not allowed, he walked out.  (*See* Dkt. No. 21-1 at 100 ("Through this process, your lack of cooperation has certainly hindered the Local's efforts on your behalf.  You refused to participate in the third step hearing after being advised that neither you nor the Union or Company have a right to tape record the hearing.  For the Union to insist on tape recording grievance step meetings, which has never been a practice of these parties or the predecessor Niagara Mohawk, would be a violation of the National Labor Relations Act.  When we tried to explain to you that there was no right, you simply left and did not participate in what was an extremely important step in the procedure.").)   The Union stopped pursuing the grievance in response to plaintiff's non-cooperation.  (*See* Dkt. No. 21-1 at 102 ("Mr. Wischnewski showed no cooperation with the grievance process as he walked out of a third-step meeting with Local 97 and NRG.").)

Plaintiff never filed a complaint with either the Equal Employment Opportunity Commission ("EEOC") or the New York State Division of Human Rights ("NYSDHR").

Plaintiff began this litigation by filing a summons with notice on November 1, 2013 in New York State Supreme Court, Erie County.  (Dkt. No. 1-2.) Defendant removed the litigation to this Court on December 30, 2013.  Plaintiff subsequently filed his complaint on February 4, 2014.  (Dkt. No. 6.)  The complaint contains five claims.  The first claim appears to be broad.  Titled "Violation of the Americans with Disability Act," the first claim contains an allegation that the "disability discrimination and subsequent retaliation due to [plaintiff's] complaint of discrimination he was subjected to by Defendant violated the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973 and the New York State Human Rights Law." (*Id.* at 9.)  In the second claim, plaintiff accuses defendant of retaliation in violation of the ADA, the Rehabilitation Act, and the NYSHRL.  In the third claim, plaintiff accuses defendant of a hostile work environment in violation of the ADA, the Rehabilitation Act, and the NYSHRL.  In the fourth claim, plaintiff appears to repeat part of the first claim and accuses defendant of violating the NYSHRL by suspending and then firing him on the basis of actual or perceived disability.  In the fifth claim, plaintiff accuses defendant of depriving him of due process in violation of both the federal and New York constitutions.

Defendant filed the pending motion on March 31, 2015.  Defendant argues for dismissal of all of plaintiff's ADA claims because plaintiff never filed a complaint with the EEOC or NYSDHR.  According to defendant, plaintiff never exhausted his administrative remedies.  Defendant argues that any claim under the Rehabilitation Act must be dismissed because the Huntley Plant is not a program or activity that receives federal financial assistance as that statute contemplates.  On substance, defendant wants plaintiff's discrimination and retaliation claims dismissed on the basis that none of the events leading to plaintiff's firing targeted an actual or perceived disability.  Plaintiff was not diagnosed with bipolar disorder before his firing.  Any workplace clashes with coworkers did not rise beyond the level of personality conflicts.  Defendant argues further that plaintiff himself has emphasized that his conflicts with coworkers and management stemmed from his concerns about safety.  Finally, defendant urges rejection of plaintiff's constitutional arguments if only because plaintiff has not identified what governmental action led to a deprivation of which constitutional rights.

Plaintiff opposes most of defendant's motion.  Plaintiff argues that claims under the NYSHRL carry a three-year limitation period and do not require prior filing with an administrative agency.  Plaintiff defends his claims under the Rehabilitation Act by citing news articles from recent years that describe various

types of federal grants that defendant has received.[4]  These news articles

concern defendant generally as a corporation and make no mention of the

Huntley Plant.  Plaintiff argues for the substance of his discrimination and

retaliation claims by arguing that a question of fact exists as to whether his

bipolar disorder caused him to act as he did when he walked off the job twice.  As

part of his argument, plaintiff notes that the Social Security Administration has

found him disabled as of August 12, 2010.  (Dkt. No. 28-10 at 1.)  Plaintiff does

make one concession concerning the fifth claim from his complaint.  "Plaintiff

concedes that his Constitutional claims fail as a matter of law against NRG as a

private corporation."  (Dkt. No. 28 at 25.)

## III.  DISCUSSION

### A.  *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  FRCP 56(a).  "As to materiality, the substantive law will

identify which facts are material.  Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of

summary judgment . . . . More important for present purposes, summary

---

[4] Between the citation of news articles and the initial citation of Rule
12(b)(6) (*see* Dkt. No. 28 at 11), the Court is a little confused about why the
record contains no information, such as deposition transcripts or internal
corporate documents, that plaintiff would have acquired during discovery to
resolve definitively whether the Rehabilitation Act applies here.

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

### B.   *Plaintiff's ADA Claims*

The Court begins briefly with the discrimination, hostile work environment, and retaliation claims that plaintiff has made under the ADA. "Before bringing suit in federal court under Title VII, ADEA, and ADA, a private plaintiff must file timely administrative charges with the Equal Employment Opportunity Commission ('EEOC'). In New York, a charge must be filed with the EEOC within 300 days of the alleged discrimination." *Hogans v. Dell Magazines/Penny Press*, 372 F. App'x 148, 149 (2d Cir. 2010) (summary order). Plaintiff never filed charges with either the EEOC or the NYSDHR. The first administrative or legal action that he took consisted of the filing of his original summons with notice on November 1, 2013 in state court. Hypothetically, even if the Court somehow could construe

12

the summons with notice as equivalent to an administrative filing, the Court still could walk back only 300 days from that date and consider any alleged discrimination that occurred as far back as January 5, 2013.  *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010) (walking back 300 days from a filing date to determine a cutoff date).  The last act of discrimination that plaintiff alleged in his complaint was his firing on November 9, 2010.  As a result, plaintiff failed to exhaust administrative remedies, and his claims under the ADA would be untimely under any circumstances.  The Court thus recommends granting defendant's motion to dismiss plaintiff's claims under the ADA, which span the first three claims in the complaint.

### C.   *Plaintiff's Rehabilitation Act Claims*

The Court next will address the discrimination, hostile work environment, and retaliation claims that plaintiff has made under the Rehabilitation Act.  Before considering the substance of plaintiff's claims, however, the Court must consider whether the Rehabilitation Act covers defendant at all.  "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a) (Westlaw 2015).  "For the purposes of this section, the term 'program or activity' means all of the operations of . . . (A) an entire corporation, partnership,

13

or other private organization, or an entire sole proprietorship (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or (B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship." *Id.* § 794(b)(3).

Here, the Court simply does not have enough information to determine that the Rehabilitation Act applies.  Under Section 794(b)(3)(A), defendant might fall under the Rehabilitation Act if it received some kind of federal assistance directed to the entire corporation as a whole.  Under Section 794(b)(3)(B), defendant might fall under the Rehabilitation Act if the Huntley Plant specifically received some kind of federal assistance.  Any sort of federal subsidy intended as a subsidy would suffice to place defendant under the Rehabilitation Act.  *See, e.g., Bishop v. Children's Ctr. for Developmental Enrichment*, No. 2:08-CV-766, 2011 WL 4337088, at *9 (S.D. Ohio Sept. 15, 2011) (federal educational grants to universities).  Any contract for goods or services would not. *See, e.g., Squire v. United Airlines, Inc.*, 973 F. Supp. 1004, 1009 (D. Colo. 1997) (funds for airport services or the air traffic control system); *Mass v. Martin Marietta Corp.*, 805 F. Supp. 1530, 1542 (D. Colo. 1992) (procurement contracts); *DeVargas v. Mason &*

14

*Hanger-Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990) (contracting out guard services).  The news articles that plaintiff has provided seem to indicate that defendant as a whole has received various types of federal subsidies including loan guarantees.  Plaintiff's news articles, however, run into evidentiary problems.  Plaintiff very plainly is submitting the news articles for the truth of the matters asserted therein; if the Court made a decision based only on these articles then the applicability of the Rehabilitation Act would rest on the accuracy of the articles' content.  *See Krause v. Buffalo & Erie Cnty. Workforce Dev. Consortium, Inc.*, 425 F. Supp. 2d 352, 378 (W.D.N.Y. 2006) (Arcara, *C.J.*) ("The court, however, may consider such statements as newspaper articles so long as they are not submitted for the truth of the matter asserted therein.") (citations omitted).  Plaintiff has no personal knowledge of these matters and, as noted above, appears to have done nothing during discovery to obtain details of any subsidies that defendant, or the Huntley Plant specifically, received.  As a result, the Court will disregard the articles.  Without more information that would have come more reliably through discovery, plaintiff's Rehabilitation Act claims must fail.  The Court thus recommends granting defendant's motion with respect to plaintiff's Rehabilitation Act claims, which also span the first three claims in the complaint.

### D.    *Plaintiff's NYSHRL Claims*

The Court next will address the discrimination, hostile work environment, and retaliation claims that plaintiff has made under the NYSHRL.  "It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's . . . disability . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a) (Westlaw 2015).  Employers also cannot "discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." *Id.* § 296(1)(e).  "The term 'disability' means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held."  *Id.* § 292(21).  Courts assess NYSHRL claims "within the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

16

802–04 (1973).  To show a prima facie case within that framework, a plaintiff

must proffer evidence (1) that she is a member of a protected class, (2) that she

is qualified for the position at issue, (3) that she was subject to a materially

adverse employment action, and (4) that the circumstances give rise to an

inference of invidious discrimination."  *Lore v. City of Syracuse*, 670 F.3d 127,

169 (2d Cir. 2012) (citation omitted).  With respect to limitations periods under the

NYSHRL, "plaintiff could recover damages for discriminatory acts within three

years of the filing of the complaint."  *Bonner v. Guccione*, 178 F.3d 581, 584 (2d

Cir. 1999).

Amidst all the other issues that the parties have raised, plaintiff's

misconduct in walking off the job twice eliminates the possibility of establishing

the first, second, or fourth elements of a *prima facie* case of discrimination.

"Well-established precedent demonstrates that the New York State Human

Rights Law does not immunize disabled employees from discipline or discharge

for incidents of misconduct in the workplace."  *Hazen v. Hill Betts & Nash, LLP*,

936 N.Y.S.2d 164, 171 (App. Div. 2012) (internal quotation marks and citations

omitted).  Plaintiff knew his responsibilities as a Coal Handler B and the

procedures for leaving a shift early if the need arose.  On December 9, 2009, he

walked off the job anyway after arguing with his coworkers.  (*See* Dkt. No. 21-1 at

43 ("Q. The disagreement that you had with the individuals in your department

which preceded your departure was a disagreement over your job duties; is that

correct?  A. That had a major factor, that probably had the—yes, I'd say that was a major factor of this outcome . . . . Some of it was just plain harassment but not particularly because of the job.  But, yes, I would say that was one of the major problems was the—of how I did my job versus another individual doing the job.").) Prior to this litigation, plaintiff never mentioned bipolar disorder as a factor in the events of December 9, 2009.  If defendant wanted to rid itself of plaintiff after the walk-off then plaintiff handed it a pretext to do so.  Defendant declined to do so. Defendant kept plaintiff on the job and counseled him about the proper procedure for leaving a shift early if the need arose.  Despite defendant's decision to keep him and despite the reminder about proper procedure, plaintiff walked off the job again on August 12, 2010 citing safety concerns, not discrimination.  (*See id.* at 54 ("Q. Was it necessary for you to abandon your job?  A. Oh, yeah, for my safety.  You got that right.  You got that absolutely correct.  I'll never back out of that.  That's—safety was the biggest issue always.  Absolutely.").)  Even then, defendant did not fire plaintiff immediately.  For the sake of possible mitigation information, defendant investigated the matter and had plaintiff undergo a fitness for duty examination and a psychological examination.  Having plaintiff undergo those examinations by themselves did not constitute a perception of disability or an adverse employment action.  *See Baum v. Rockland Cnty.*, 161 F. App'x 62, 64 (2d Cir. 2005) (summary order); *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 647 (2d Cir. 1998), *superseded in part by statute on other grounds by* 42

18

U.S.C. § 12102(3)(A) (2008), *as recognized in Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 88 (2d Cir. 2010) (summary order).  Plaintiff's own Union filed a grievance in his behalf and tried to investigate the matter for him.  Plaintiff walked out of his own Union's investigation.  (*See* Dkt. No. 21-1 at 100 ("Through this process, your lack of cooperation has certainly hindered the Local's efforts on your behalf.  You refused to participate in the third step hearing after being advised that neither you nor the Union or Company have a right to tape record the hearing.  For the Union to insist on tape recording grievance step meetings, which has never been a practice of these parties or the predecessor Niagara Mohawk, would be a violation of the National Labor Relations Act.  When we tried to explain to you that there was no right, you simply left and did not participate in what was an extremely important step in the procedure.").)  The Union then gave up.  By the time plaintiff's own Union gave up on him, plaintiff established a track record of impulsive, bad judgment that defendant deemed hazardous to its other employees.  *Cf. Cuttler v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, No. 10 CIV. 296 DAB, 2012 WL 1003511, at *9 (S.D.N.Y. Mar. 23, 2012) ("Plaintiff admits that she engaged in the conduct for which she was disciplined, though she argues that she did so because her ADD required her to remain constantly busy and prevented her from functioning well in an environment in which she had insufficient work to do.  Unfortunately for Plaintiff, the NYSHRL and NYCHRL do not require Defendant to excuse her admitted

workplace misconduct as an accommodation of her disability."); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 288 (S.D.N.Y. 1999) (finding a bipolar plaintiff not qualified to perform his job after he threatened coworkers on multiple occasions).  Plaintiff did not obtain any formal psychological diagnoses during his employment, and stray comments about his temperament would not rise to a perception of a disability.  *Cf. Hazen*, 936 N.Y.S.2d at 171 ("In this case, the record is clear that it was not until after the petitioner accrued the expenses on his corporate credit card, and was asked to account for them, that he then consulted an attorney and sought a diagnosis from a psychiatrist."); *see also Kelly v. N. Shore-Long Island Health Sys.*, No. 13-CV-1284 JS WDW, 2014 WL 2863020, at *7 (E.D.N.Y. June 22, 2014) (dismissing a disability discrimination complaint in part because "the Complaint stops short of alleging facts from which it can be inferred that anyone at LIJ regarded Plaintiff as a recovering alcoholic"). Even if plaintiff had psychological factors in the background during his employment that worsened his judgment, the NYSHRL does not mandate endangering coworkers to accommodate those factors.  *Cf. O'Dette v. N.Y.S. Unified Crt. Sys.*, 969 N.Y.S.2d 2, 3 (App. Div. 2013) ("To the extent that his conduct was attributable to his illness [Tourette's Syndrome and obsessive-compulsive disorder], the law does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace.") (citing *Hazen*).

Plaintiff thus has failed to make a *prima facie* case for any kind of violation under the NYSHRL.  "Only once plaintiff has established a *prima facie* case of discrimination does the burden of production shift to defendant to demonstrate a legitimate and non-discriminatory reason for employee's discharge.  Because plaintiff has not established a *prima facie* case of discrimination, [the Court] need not address the reasons proffered by defendant for plaintiff's discharge." *Quintana v. Sound Distribution Corp.*, No. 95 CIV. 0309 LAP, 1997 WL 40866, at *7 (S.D.N.Y. Feb. 3, 1997).  The Court recommends granting defendant's motion to dismiss plaintiff's NYSHRL claims, which cover the rest of the first three claims in the complaint and all of the fourth claim.

### E.   *Plaintiff's Constitutional Claims*

The Court mentions plaintiff's constitutional claims here briefly just for the sake of completeness.  As noted above, plaintiff has withdrawn these claims voluntarily.  (Dkt. No. 28 at 25.)  The Court thus recommends granting defendant's motion with respect to the fifth claim in the complaint.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendant's motion (Dkt. No. 17).

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and

Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

      SO ORDERED.

                              ___/s/ Hugh B. Scott_____
                              HONORABLE HUGH B. SCOTT
                              UNITED STATES MAGISTRATE JUDGE

DATED: July 2, 2015